EXHIBIT C Page 1

**THIN BLUE LINE BENEFITS ASSOCIATION HOLDINGS LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**


This Limited Liability Company Agreement (this "**Agreement**"), effective as of May 26, 2020, is entered into by and among Thin Blue Line Benefits Association Holdings LLC, a Texas limited liability company (the "**Company**"), and the Persons set forth on the signature page hereof.

## ARTICLE I

### FORMATION OF COMPANY

Section 1.1.    _Formation_. The Company was formed as a Texas limited liability company by the filing of a Certificate of Formation (as amended from time to time, the "**Certificate**") with the Secretary of State of the State of Texas on May 26, 2020, pursuant to the provisions of the Texas Business Organizations Code (such statute and any successor statute, as amended from time to time, the "**TBOC**"), and the taking effect of the Certificate pursuant to the TBOC.

Section 1.2.    _Name_. The name of the Company shall be Thin Blue Line Benefits Association Holdings LLC. Subject to all applicable laws, the business of the Company shall be conducted in the name of the Company unless under the law of some jurisdiction in which the Company does business such business must be conducted under another name. In such a case, the business of the Company in such jurisdiction may be conducted under such other name or names as the Managers of the Company shall determine to be necessary. The Managers shall cause to be filed on behalf of the Company such assumed or fictitious name certificate or certificates or similar instruments as may from time to time be required by law.

Section 1.3.    _Business_. The business of the Company shall be to engage in or perform any and all acts or activities that may be lawfully conducted by a limited liability company organized pursuant to the TBOC.

Section 1.4.    _Places of Business; Registered Agent_.

(a)    The street address of the principal United States office and place of business of the Company shall be 208 Fulton Avenue, Rockport, TX 78382. The Managers may change the location of the Company's principal place of business and may establish such additional place or places of business of the Company as the Managers shall determine to be necessary or desirable.

(b)    The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the

State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

Section 1.5.    _Term_. The Company shall be formed and commence on the date of the filing of the Certificate, and shall continue until terminated in accordance with Article VIII.

Section 1.6.    _Filings_. Upon the request of the Managers, the Members promptly shall execute and deliver all such certificates and other instruments conforming hereto as the Managers, in their sole discretion, deem necessary for them to accomplish all filing, recording, publishing and other acts appropriate to comply with all requirements for the formation and operation of a limited liability company under the laws of the State of Texas and for the qualification and operation of a limited liability company (or a comparable company in which the Members have limited liability) in all other jurisdictions where the Company shall propose to conduct business. Prior to conducting business in any jurisdiction, the Managers shall use their reasonable good faith efforts to cause the Company to comply with all requirements for the qualification of the Company to conduct business as a limited liability company (or a comparable company in which the Members have limited liability) in such jurisdiction.

Section 1.7.    _Title to Company Property_. All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property. The Company may hold its property in its own name or in the name of a nominee, which may be an Affiliate or any trustee or agent designated by the Managers.

## ARTICLE II

### DEFINITIONS AND REFERENCES

Section 2.1.    _Defined Terms_. When used in this Agreement, the following terms will have the meanings respectively indicated:

"**Additional Contributions**" shall have the meaning assigned to such term in Section 4.2.

"**Affiliate**" shall mean, when used with respect to a Person, any Person directly or indirectly controlling, controlled by or under common control with such Person. As used in this definition of "Affiliate," the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"**Agreement**" means this Limited Liability Company Agreement, as amended from time to time.

"**Business Day**" means any day of the year except a Saturday, Sunday or other day on which banks in Houston, Texas are authorized by law to close.

"**Capital Account**" shall mean the Capital Account maintained for each Member, as provided in Section 4.4.

"**Capital Contribution**" shall mean, for any Member at the particular time in question, the aggregate of the dollar amounts of any cash and the fair market value of any property contributed to the capital of the Company, or, if the context in which such term is used so indicates, the dollar amounts of cash and the fair market value of any property agreed to be contributed, or requested to be contributed, by such Member to the capital of the Company.

"**Certificate**" shall have the meaning assigned to such term in Section 1.1.

"**Company**" shall have the meaning assigned to such term in the introductory paragraph.

"**Excluded Affiliate Transfer**" shall mean (a) in the case of a Member that is an entity, any Transfer of a Units by a Member to a member, partner or other Affiliate or a legal successor of such Member, or (b) in the case of a Member that is an individual, any Transfer of a Units by such Member to (i) a parent, spouse or descendant of such Member, (ii) a trust for the exclusive benefit of a spouse and/or descendant of such Member in the event of such Member's death, or (iii) a trust or family limited partnership for estate planning purposes if the Member retains the sole right to vote (or solely to control the vote of) such Units following such Transfer; provided that in either (a) or (b) such transferee agrees to be bound by the terms of this Agreement and evidences same by executing a copy of this Agreement promptly upon receiving the assignment of such Units.

"**Fiscal year**" means the calendar year ended each December 31 or such other annual period of time as determined by the Managers in their sole discretion.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any comparable successor statute or statutes.

"**Majority Interest**" means those Members whose combined Percentage Interests exceed Eighty Per Cent (80%) of the aggregate Percentage Interests of all Members.

"**Managers**" means initially Anna Reed.

"**Member**" means each Person (a) executing this Agreement as of the date of this Agreement as a member or who is admitted as a Member after the date of this Agreement or becomes a substituted Member of the Company pursuant to the terms of this Agreement, and (b) who has not ceased to be a Member as contemplated by this Agreement.

"**Net Profits**" or "**Net Losses**" shall mean, with respect to any fiscal year or other fiscal period, the net income or net loss of the Company for such period, determined in accordance with U.S. federal income tax accounting principles and the Internal Revenue Code.

"**Percentage Interest**" shall mean, when used with reference to a Member, the Percentage Interest set forth opposite such Member's name in Exhibit A attached hereto, which shall be equal to the number of Units that such Member owns divided by the total number of Units issued and outstanding. The Percentage Interests shall be adjusted, as required, in the event of any assignment of a Units or the admission of any new Member.

"**Person**" (whether or not capitalized) shall mean any natural person, corporation,

company, limited or general partnership, joint stock company, joint venture, association, limited liability company, trust, bank, trust company, business trust, or other entity or organization, whether or not a governmental authority.

"**Proceeding**" shall have the meaning assigned to such term in <u>Section 10.1</u>.

"**Tax Matters Partner**" shall have the meaning assigned to such term in <u>Section 6.12</u>.

"**TBOC**" shall have the meaning assigned to such term in <u>Section 1.1</u>.

"**Transfer**" including the correlative terms, means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation, mortgage or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law).

"**Unit**" shall have the meaning set forth in Section 3.2(a).

Section 2.2. *References and Titles*. All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. There is no incorporation by reference unless stated. Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

Section 2.3. *Rules of Construction*. Unless the context otherwise requires, (i) the use of the word "or" is not exclusive, (ii) pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, (iii) words in the singular form shall be construed to include the plural and vice versa, (iv) an accounting term not otherwise defined has the meaning assigned to it in accordance with accounting principles that are generally accepted in the United States of America, (v) any date specified for any action that is not a Business Day shall be deemed to mean the first Business Day after such date, (vi) reference to a corporation, partnership or limited liability company includes its successors and assigns and any Person (whether a corporation or partnership or an officer, accountant, counsel, agent or other representative thereof) to whom the exercise of a right or the performance of an obligation hereunder has been delegated.

### ARTICLE III

#### MEMBERS AND UNITS

Section 3.1. *Members*. The names of the initial Members of the Company are as set forth on <u>Exhibit A</u> attached hereto.

Section 3.2. *Units.*

(a)    The Company shall have two classes of membership interests as follows: Class A Voting Units, of which there shall be Twenty Million (20,000,000) Units authorized, which shall

be referred to herein as "Class A Voting Units"; and Class B Nonvoting Units, of which there shall be Ten Million (10,000,000) Units authorized, which shall be referred to herein as "Class B Nonvoting Units."  All Class B Nonvoting Units shall automatically become Class A Voting Units when, as and if of the first to occur of (i) Anna Reed no longer being the sole  Manager, (ii) the change of 50% or more of the Percentage Interests of the Members, (iii) the sale of substantially all of the assets of the Company or Member Interests, or (iv) the date of May 26, 2021. Members sometimes are herein called "Unitholders", and the Class A and B Units are herein sometimes called the "Units".

(b)    Exhibit A sets forth the number of Units owned by each Member upon making the initial Capital Contributions to the Company in accordance with Section 4.1 and includes the number of Units outstanding at any time.  Exhibit A may be amended at any time without the approval of any of the Members hereof to state the current number of outstanding Units. Upon making the Capital Contributions set forth in Sections 4.1, the Members shall acquire the Units.

(c)    Ownership of Units may be evidenced by certificates (in this Section, "**Unit Certificates**").  The Company may issue one or more Unit Certificates to each Member, which Unit Certificates need not bear a seal of the Company but shall be signed by a Manager or other Person authorized by the Managers to sign such Unit Certificates certifying the number, class and series of Units represented by such certificate.  The Unit Certificates, if issued, shall be consecutively numbered (on a class-by-class or series-by-series basis) and shall be entered in the books of the Company as they are issued and shall exhibit the holder's name and number of Units.  The Managers may determine the conditions upon which a new Unit Certificate may be issued in place of a Unit Certificate that is alleged to have been lost, stolen or destroyed and may, in their discretion, require the owner of such Unit Certificate or its legal representative to give bond, with sufficient surety, to indemnify the Company and each transfer agent and registrar against any and all losses or claims that may arise by reason of the issuance of a new Unit Certificate in the place of the one so lost, stolen or destroyed.  Each Unit Certificate, if issued, shall bear a legend on the reverse side thereof substantially in the following form:

**THE UNITS EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, EXCHANGED, MORTGAGED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND ANY SUCH LAWS IS AVAILABLE. THE UNITS EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE COMPANY AGREEMENT OF THE COMPANY, AS THE SAME MAY BE AMENDED FROM TIME TO TIME. A COPY OF SUCH AGREEMENT WILL BE FURNISHED TO THE RECORD HOLDER OF THE UNITS EVIDENCED BY THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL OFFICE OR REGISTERED OFFICE.**

Section 3.3.    *Additional Members and Units*. Additional Persons may be admitted to the Company as Members and Units may be issued to such Persons as follows:

(a)      If a Person desires to acquire Units directly from the Company such acquisition may be made and such Person admitted to the Company as an additional Member, provided that a Majority Interest gives their prior written consent to such acquisition and admission and the terms and conditions thereof. Upon the issuance of any additional Units and the admission of any additional Member, the Managers will recompute the Percentage Interests of the Members, as appropriate to reflect the dilution of the Percentage Interests of the existing Members, and shall amend Exhibit A to reflect the recomputation.

(b)      If a Person desires to acquire Units pursuant to a Transfer from an existing Member, such Transfer and the admission of the Person as a substituted Member shall become effective only upon compliance with the provisions set forth in Article IX.

Section 3.4.    *Liability to Third Parties*. No Member, solely by reason of being a Member, shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

Section 3.5.    *Limitations on Members*. Other than to the extent in which a Member is serving in his or its capacity as a Manager, no Member shall: (a) be permitted to control or direct the business or affairs of the Company; (b) have any voice in the management or operation of any Company property; (c) have the authority or power to act as agent for or on behalf of the Company or any other Member, (d) do any act which would be binding on the Company or any other Member, or (e) incur any expenditures on behalf of or with respect to the Company. Other than when a Member is acting within his or its authority and capacity as a Manager, no Member shall hold out or represent to any third party that the Members have any such power or right or that the Members are anything other than "members" in the Company.

Section 3.6.    *Meetings*. Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, the Certificate or this Agreement, may be called by the Managers. Until so called, the Company need not hold any meetings of the Members. Any business may be conducted at a properly called meeting of the Members.

Section 3.7.    *Place of Meetings*. Meetings of Members shall be held at the Company's principal place of business or at such other places, within or without the State of Texas, as may from time to time be fixed by the Managers. The Chairman of the Managers shall preside when present at all meetings of the Members. In the absence of the Chairman of the Managers at any meeting of the Members, the Members present at such meeting shall designate another Manager to preside at such meeting.

Section 3.8.    *Notice of Meetings*. Written or printed notice stating the place, date and time of each meeting of the Members shall be delivered not less than ten (10) nor more than sixty (60) calendar days before the date of the meeting, either personally or by mail, telegram, telecopier, email or similar communication, by or at the direction of the Person(s) calling the meeting, to each Member entitled to vote at the meeting.

Section 3.9.    *Quorum of Members*. The holders of a Majority Interest of the Units then outstanding and entitled to vote thereat, present in person or represented by proxy, shall be requisite to and shall constitute a quorum at each meeting of Members for the transaction of

business, except as otherwise provided by the TBOC or the Certificate. Unless otherwise provided in the Certificate, the Members represented in person or by proxy at a meeting of Members at which a quorum is not present may adjourn the meeting until such time and to such place as such Members may determine. At any such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally convened. Unless otherwise provided in the Certificate, once a quorum is present at a meeting of Members, the Members represented in person or by proxy at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any Member represented in person or by proxy, or the refusal of any Member represented in person or by proxy to vote, shall not affect the presence of a quorum at the meeting.

Section 3.10. *Action and Voting by Members*.

(a)     The Members shall elect the Managers in accordance with Section 6.3 of this Agreement.

(b)     With respect to any matter for which the affirmative vote of a majority of the holders of a specified portion of the Units entitled to vote is required by the TBOC or the Certificate, a vote by a Majority Interest shall constitute the act of the Members.

(c)     At any meeting of the Members, every Member having the right to vote shall be entitled to vote either in person or by proxy executed in writing by such Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile, portable document format (pdf) or similar reproduction of a writing executed by the Member, shall be treated as an execution in writing for purposes of this Section 3.9. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. Each proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Each proxy shall be delivered to the Managers prior to or at the time of the meeting of Members.

Section 3.11. *Action Without a Meeting*. Any action required by the TBOC to be taken at any meeting of Members, or any action which may be taken at any meeting of Members, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action to be taken, shall be signed by all of the Members that otherwise would be necessary to authorize such action had an actual meeting and vote of the Members pertaining to such action been held as contemplated in this Agreement or otherwise mandated pursuant to the TBOC. Any such writing or writings shall be filed with the minutes of proceedings of the Members. A telegram, telex, cablegram, email or similar transmission by a Member, or a photographic, photostatic, facsimile, portable document format (pdf) or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section 3.10. The Secretary of the Company shall promptly send copies of all such writings which effect actions by the Members to each of the Members.

Section 3.12. *Withdrawal and Return of Capital Contribution*. The Members shall not be entitled to (a) withdraw from the Company except upon the assignment by such Member of all of his or its interest in the Company in accordance with Article IX, or (b) the return of his, her

or its Capital Contributions except to the extent, if any, that distributions made pursuant to the express terms of this Agreement may be considered as such by law or upon winding up and liquidation of the Company, and then only to the extent expressly provided for in this Agreement and as permitted by law.

## ARTICLE IV

### CAPITAL CONTRIBUTIONS

Section 4.1. *Initial Capital Contribution*. Each Member has made the initial Capital Contribution as set forth in Exhibit A attached hereto. Notwithstanding anything to the contrary herein, such initial Capital Contribution shall be the maximum contribution to the Company that such Member shall be required to make.

Section 4.2. *Additional Capital Contributions*. At any time and from time to time, the Members may make additional Capital Contributions ("**Additional Contributions**") to the capital of the Company. In no event shall the Managers be obligated to call for Additional Contributions nor shall the Members be required to make Additional Contributions.

Section 4.3. *Advances by Members*. If the Company does not have sufficient cash to pay its obligations or is otherwise in need of working capital, any Member that may agree to do so with the consent of the Managers may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section 4.3 constitutes a loan from the Member to the Company and shall bear interest from the date of the advance until the date of payment at a rate per annum equal to the Prime Rate at the date of the advance and shall not constitute a part of such Member's Capital Contribution.

Section 4.4. *Capital Accounts*. An individual capital account (a **"Capital Account"**) shall be maintained by the Company for each Member as provided by the Internal Revenue Code.

## ARTICLE V

### ALLOCATION AND DISTRIBUTIONS

Section 5.1. *Allocations*. Net Profits and Net Losses shall be allocated among the persons who were Members during the relevant taxable year.

Section 5.2. *Distributions*. The Managers shall determine to what extent (if any) the Company's cash and other property on hand exceeds the Company's current and anticipated needs, including, without limitation, the need for a reasonable contingency reserve of $50,000. If such an excess exists, the Company shall distribute such excess cash to the Members to satisfy any tax they may have arising out of their ownership in the Company, and may distribute the balance of such excess cash or other property to the Members. All distributions to the Members shall be made in accordance with their respective Percentage Interests. Notwithstanding the foregoing, all distributions in liquidation of a Member's Units must be made in accordance with Article VIII.

## ARTICLE VI

### MANAGERS

Section 6.1.   *Management by Managers*.

(a)      Except for situations in which the approval of the Members is required by this Agreement (including Section 6.2) or by nonwaivable provisions of applicable law, (i) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers, and (ii) the Managers may make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(i)      the entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(ii)      the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurring of any obligations the Managers deem necessary or advisable for the conduct of the business activities of the Company;

(iii)      the formation of any limited or general partnerships, joint ventures, corporations or other relationships that the Managers deem desirable, and the contribution to such partnership, ventures, corporations or other relationships of assets and properties of the Company;

(iv)      the selection, employment and dismissal of employees and outside attorneys, accountants, consultants and contractors and the determination of their compensation and other terms of employment or engagement;

(v)      the representation of the Company before any governmental authority or regulatory agency and the making of all necessary or appropriate filings before such authority or agency;

(vi)      the control of any matters affecting the rights and obligations of the Company, including the conduct of litigation and the incurring of legal expenses and the settlement of claims and litigation;

(vii)      the appointing of attorneys-in-fact and officers who will act on behalf of the Company;

(viii)      the determining of distributions of Company cash and other property as provided in Section 5.2;

(ix)      the making of decisions on behalf of the Company with respect to federal, state and local tax matters as the Managers deem advantageous to the Company,

including, without limitation, an election under Section 754 of the Internal Revenue Code;

(x)     the procuring and maintaining in force such insurance as the Managers shall deem prudent to serve as protection against liability for loss and damage which may be occasioned by the activities to be engaged in by the Company;

(xi)    the opening, maintaining and closing of bank accounts and custodial accounts and the execution and delivery of all checks, drafts, endorsements and other orders for the payment of Company funds;

(xii)   the admittance of substituted Members in accordance with the terms of this Agreement; and

(xiii)  the execution and delivery of such other documents and the performance of such other acts as may be deemed by the Managers to be appropriate to carry out the business and affairs of the Company in accordance with this Agreement.

(b)     In managing the business and affairs of the Company and exercising its powers, the Managers shall act (i) collectively through meetings pursuant to Section 6.4 and by written consents pursuant to Section 6.5(b), and (ii) through Managers to whom authority has been delegated pursuant to subsection (c) hereof.

(c)     The Managers may, from time to time, delegate to one or more Managers such authority and duties as the Managers may deem advisable. In addition, without limiting the ability of the Managers to appoint other persons to serve as officers pursuant to Section 6.9 of this Agreement, the Managers may assign titles (including titles such as chief executive officer, chief operations officer, chief financial officer, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer) to any such Manager. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation formed under the TBOC, the assignment of such title shall constitute the delegation to such Manager of the authority and duties that are commonly associated with that office, subject to any specified delegation of authority and duties made pursuant to the first sentence of this Section 6.1(c). Any delegation pursuant to this Section 6.1(c) may be removed at any time by the Managers.

(d)     The Managers shall select a Chairman of the Managers, who shall preside over all meetings of the Members as well as meetings of the Managers. The initial Chairman of the Managers shall be Anna Reed.

Section 6.2.    *Certain Restrictions on Managers' Power and Authority*. Notwithstanding any other provisions of this Agreement to the contrary, the Managers shall not have the power or authority to, and shall not, do, perform or authorize any of the following without having received the prior written consent of a Majority Interest:

(a)     to create, incur, or assume any indebtedness, the outstanding principal amount of which exceeds $100,000 at any one time;

(b)      to guarantee in the name or on behalf of the Company the payment of money or the performance of any contract or other obligation of any person other than the Company or any of its subsidiaries or as is required in the ordinary course of business;

(c)      to mortgage, pledge, assign in trust or otherwise encumber any property or assets of the Company or assign any monies owed or to be owed to the Company, except for (A) customary liens contained in or arising under agreements executed by or binding on the Company, (B) liens for taxes and other governmental charges and assessments which are not yet due and payable or the validity of which is being contested in good faith by appropriate proceedings and (C) mechanics', materialmens' and other similar liens arising in the ordinary course of business for sums not yet due and payable or the validity of which is being contested in good faith by appropriate proceedings;

(d)      to merge or consolidate the Company with any other entity, convert the Company into another form of entity or exchange interests with any other person or entity; or

(e)      to take any action, authorize or approve, or enter into any binding agreement with respect to the foregoing.

Section 6.3.      *Number and Selection of Managers*.

(a)      Initially, there shall be one Manager of the Company, Anna Reed. The number of Managers may be increased or decreased by a Majority Interest at any time.

(b)      The Managers will be elected by vote of a Majority Interest, but need not be elected annually. Each Manager will serve until the Manager's successor is elected and qualified or until the earlier of (i) the Manager's resignation; (ii) the Manager's death or extended mental disability (as determined by a licensed physician selected and approved by a majority of the Managers); and (iii) a Manager's removal by a Majority Interest.

(c)      Any vacancy of a Manager shall be filled by a vote of a Majority Interest.

Section 6.4.      *Meetings of the Managers*.

(a)      Place of Meetings. Meetings of the Managers, regular or special, may be held either within or without the State of Texas.

(b)      Regular Meetings. Regular meetings of the Managers, of which no notice shall be necessary, may be held at such times and places as may be fixed from time to time by resolution adopted by the Managers. Except as otherwise provided by statute or the Certificate, any and all business that may be performed by the Managers hereunder may be transacted at any regular meeting.

(c)      Special Meetings. Special meetings of the Managers may be called by the Chairman of the Managers by giving written notice thereof to the other Managers. Such notice of a special meeting of the Managers shall state the time, date and purpose or purposes of the proposed meeting, and it shall be given to the other Managers so that it is actually received no

less than two (2) Business Days, and no more than 14 calendar days, prior to the date of the meeting.

Section 6.5. *Quorum of and Action by the Managers*.

(a)     Quorum. At all meetings of the Managers, the presence in person or by proxy of at least one Manager shall be necessary to constitute a quorum for the transaction of business. Subject to subparagraph (b) below, the approval by a majority of the Managers present at any meeting at which there is a quorum shall be the act of the Managers. If a quorum shall not be present at any meeting of the Managers, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. At any such adjourned meeting any business may be transacted that might have been transacted at the meeting as originally convened if a quorum is subsequently obtained.

(b)     Action Without a Meeting. Unless otherwise restricted by the Certificate, any action required or permitted to be taken at any meeting of the Managers may be taken without a meeting if all of the Managers consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Managers. Such consent shall have the same force and effect as a vote of a majority of the Managers at a meeting.

(c)     Telephonic Conference Meeting. Unless otherwise restricted by the Certificate, subject to the requirement for notice of meetings, the Managers may participate in a meeting of the Managers by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 6.6. *Duties and Services of the Managers*. During the existence of the Company, the Managers shall devote such time and effort to the Company's business as the Managers, in good faith, believe to be reasonably necessary to promote adequately the interests of the Company and the mutual interests of the Members; however, it is specifically understood and agreed that the Managers shall not be required to devote full time to the Company's business. The Managers shall be obligated to perform the duties, responsibilities and obligations set forth herein only to the extent that funds of the Company are available therefor. The Members hereby expressly agree that (a) there is no duty or obligation of any Manager or its Affiliates to offer to the Company or the Members any particular business opportunity, project or property which may become available to such Manager or its Affiliates; and (b) any duty of loyalty owed by a Manager under any applicable law or otherwise shall not be violated by participation in the types or categories of activities described in this Section 6.6 or the other express provisions of this Agreement, so long as the standards and provisions of such activities are not manifestly unreasonable.

Section 6.7. *Contracts with Affiliates*. The Managers may retain or use the personnel, properties and equipment of any Manager, Member or their respective Affiliate(s) or the Managers may hire or rent those of third parties and may employ on a temporary or continuing basis outside accountants, attorneys, consultants and others on such terms as the Managers deem

advisable. The Company may enter into contracts and agreements with any Manager, Member or their respective Affiliate(s) for the rendering of services and the sale and lease of supplies and equipment on such terms as the Managers determine in good faith to be fair and reasonable.

Section 6.8.    _Reimbursement of Managers_. The Company shall pay or reimburse to the Managers, as a Company expense, all direct and indirect costs and expenses incurred by the Managers in organizing the Company and in managing and conducting the business and affairs of the Company, including, without limitation, (i) secretarial, telephone, office rent and other office expenses; (ii) salaries and other compensation expenses of employees, officers and directors; (iii) other administrative expenses; (iv) travel expenses; (v) legal and accounting costs and expenses; and (vi) expenses incurred in providing or obtaining such other professional, technical, administrative services and advice as the Managers may deem necessary or desirable. The Managers shall determine which expenses are allocable to the Company in a manner which is fair and reasonable to the Managers and the Company, and if such allocation is made by the Managers in good faith it shall be conclusive in the absence of manifest error.

Section 6.9.    _Officers_. The Managers shall have the right to designate one or more individuals as officers of the Company, which may include a President, Vice Presidents, Treasurer or Secretary or such other offices to exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers, including initially the powers and duties set forth below with respect to any President, Vice President, Treasurer or Secretary. Officers need not be Members, Managers or residents of the State of Texas. Any officer may be removed by the Managers at any time, with or without cause. The term of an officer's service, as well as the salary and other compensation, if any, to be paid an officer shall be determined by the Managers. Each officer shall have the authority to take actions and execute and deliver documents to carry on the ordinary business and affairs of the Company to the extent authorized by the Managers.

(a)    President. The President shall, subject to the provisions of this Agreement, have general supervision of the affairs of the Company and shall have general and active control of all its business. In the event of the absence or disability of all the Managers, the President shall preside when present at meetings of the Members. If so authorized by a resolution adopted by the Managers, he shall have power and general authority to execute bonds, deeds, and contracts in the name of the Company and to affix the corporate seal thereto; to sign Units certificates, if any; to cause the employment or appointment of such employees and agents of the Company as the proper conduct of operations may require and to fix their compensation, subject to the provisions of this Agreement; to remove or suspend any employee or agent who shall have been employed or appointed under his authority or under authority of an officer subordinate to him; to suspend for cause, pending final action by the authority which shall have elected or appointed him, any officer subordinate to the President; and in general to exercise all the powers usually appertaining to the office of president of a company, except as otherwise provided by the TBOC or this Agreement. In the event of the absence or disability of the President, his duties shall be performed and his powers may be exercised by the Vice President, unless otherwise determined by the President or the Managers.

(b)    Vice Presidents. The Vice Presidents, in the order of their seniority, will perform the duties and exercise the powers of the President if the President is absent or disabled, unless

otherwise determined by the President, and will have such authority and responsibilities delegated to them by the Managers or the President.

(c)     Treasurer. The Treasurer will keep or cause to be kept the books of account of the Company and will render statements of the financial affairs of the Company in such form and as often as required by this Agreement, the Managers or the President. The President shall have responsibility for the custody and control of all funds and securities of the Company.   The President will perform all other duties commonly incident to the office of treasurer and will perform such other duties and have such other powers as this Agreement, the Managers or the President designates from time to time.

(d)     Secretary. The Secretary shall keep and account for all books, documents, papers and records of the Company except those for which some other officer or agent is properly accountable. The Secretary shall have authority to sign Units certificates, if any, and shall generally perform all duties usually appertaining to the office of secretary of a company. In the event of the absence or disability of the Secretary, the Secretary's duties shall be performed and his powers may be exercised by an assistant secretary, if any, unless otherwise determined by the Secretary, the President, or the Managers.

(e)     Other Offices. Any other officer appointed by the Managers shall have such authority and responsibilities as the Managers or the President may delegate to such officer from time to time.

Section 6.10.  *Tax Elections*. The Managers shall make such tax elections on behalf of the Company as they shall deem appropriate in their sole discretion; provided, however, that the Members hereby agree to classify the Company as a partnership for federal income tax purposes and shall make no election to the contrary.

Section 6.11.  *Tax Returns*. The Managers shall prepare or cause to be prepared and timely file all federal, state and local income and other tax returns and reports as may be required as a result of the business of the Company.

Section 6.12.  *Tax Matters Member*. The Chairman of the Managers shall be designated the "tax matters partner" (as such term is defined under Section 6231 of the Internal Revenue Code) (the **"Tax Matters Partner"**). The Tax Matters Partner is authorized to take such actions and to execute and file all statements and forms on behalf of the Company that may be permitted or required by the applicable provisions of the Internal Revenue Code or Treasury Regulations issued thereunder. The Tax Matters Partner shall have full and exclusive power and authority on behalf of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Such power and authority shall include, without limitation, the power and authority to extend the statute of limitations and file a request for administrative adjustment.

Section 6.13. _Tax Classification._ The Company initially will have more than one Member, and thus will be treated as a partnership for U.S. federal income tax purposes unless the Members make an affirmative election otherwise.

## ARTICLE VII

### BOOKS AND RECORDS, ACCOUNTS AND REPORTS

Section 7.1. _Books and Records_. The Managers shall keep or cause to be kept full and accurate books of account for the Company in accordance with the terms of this Agreement. Such books shall be maintained at the principal office of the Company or such other location as the Managers may deem appropriate.

Section 7.2. _Bank Accounts_. The Managers shall cause one or more accounts to be maintained in a bank (or banks) or other financial institution, which accounts shall be used for the payment of the expenditures incurred by the Company in connection with the business of the Company, and in which shall be deposited any and all receipts of the Company. The Managers shall determine the number of and the Persons who will be authorized as signatories on each such bank account. The Managers may invest the Company funds in such money market accounts or other investments as the Managers shall determine to be necessary or appropriate.

Section 7.3. _Reports_. The Company shall deliver to the Members such reports and financial statements, if any, as the Managers shall from time to time determine necessary or advisable.

## ARTICLE VIII

### WINDING UP, LIQUIDATION AND TERMINATION

Section 8.1. _Winding Up_. The Company shall be wound up upon the occurrence of any of the following:

(a)     The written consent of the Managers and all of the Members to so dissolve;

(b)     The sale, disposal or abandonment of all or substantially all of the Company's assets; or

(c)     The occurrence of any other event which, under the TBOC, causes the winding up of the Company.

Section 8.2. _Revocation of Winding Up_. To the extent permitted by the TBOC, all of the Members may elect to revoke the winding up of the Company and continue the business of the Company by affirmative vote or written consent without winding up.

Section 8.3. _Liquidation and Termination_. Upon winding up of the Company, the Managers or a Person selected by the Managers, of if there are no remaining Managers, by a Majority Interest, shall act as liquidator or shall appoint one or more liquidators who shall have full authority to wind up the affairs of the Company and make final distribution as provided

herein. The liquidator shall continue to operate the Company properties with all of the power and authority of the Managers (including, without limitation, the power to sell all or substantially all of the assets of the Company). The steps to be accomplished by the liquidator are as follows:

(a)     As promptly as possible after winding up and again after final liquidation, the liquidator, if requested by any Member, shall cause a proper accounting to be made by the Company's independent accountants of the Company's assets, liabilities and operations through the last day of the month in which the winding up occurs or the final liquidation is completed, as appropriate.

(b)     The liquidator shall pay all of the debts and liabilities of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision therefor (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).

(c)     All remaining assets of the Company shall be distributed to the Members as follows:

(i)     the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the capital accounts of the Members in accordance with Section 5.1;

(ii)     with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the capital accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in the property that has not been reflected in the capital accounts previously would be allocated among the Members under Section 5.1 if there were a taxable disposition on that property for the fair market value on the date of distribution; and

(iii)     Company property shall be distributed among the Members in accordance with the positive Capital Account balance of the Members, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the partnership occurs (other than those made by reason of this clause (iii)); and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 8.3. For purposes of the preceding sentence, the term "liquidation" shall have the same meaning as set forth in Treasury Regulation § 1.704-1(b)(2)(ii). The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8.3 constitutes a complete return to the Member of its Capital Contribution and complete distribution to the Member of its Units and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of §101.154 of the

TBOC. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

Section 8.4.    *Deficit Capital Accounts*. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, no Member shall be obligated to restore a deficit balance in its Capital Account at any time.

Section 8.5.    *Certificate of Termination*. On completion of the distribution of the Company assets as provided herein, the Company shall be terminated and the Managers (or such other Person or Persons as the TBOC may require or permit) shall cause a Certificate of Termination to be filed with the Secretary of State of Texas, cancel any other filings made pursuant to Section 1.6, and take such other actions as may be necessary to terminate the Company.

## ARTICLE IX

### ASSIGNMENT OF UNITS

Section 9.1.    *Assignment by Members*. A Member's Units shall not be Transferred without complying with the applicable terms of this Article IX; *provided however,* that any Member may Transfer its Units pursuant to an Excluded Affiliate Transfer without complying with the terms of this Article IX, and upon such transfer the transferee will become a substituted Member. Unless a transferee becomes a substituted Member in accordance with the provisions of this section, such transferee shall not be entitled to any of the rights or powers granted to a Member hereunder, other than the right to receive allocations of income, gain, loss, deduction, credit and similar items and distributions to which the assignor would otherwise be entitled to the extent such items are assigned. Any attempt by a Member to Transfer his or its Units in violation of this Article IX shall be void ab initio.

Section 9.2.    *Substitution of Members*. In addition to compliance with the provisions of Section 9.1 to the extent applicable, a transferee of the interest of a Member may become a substituted Member subject to the following terms, conditions and limitations:

(a)    The transferor has given the transferee the right to become a substituted Member;

(b)    The Managers and a Majority Interest have consented to the substitution; and

(c)    The transferee shall have executed and delivered such instruments and documents, in form and content satisfactory to the Managers, as the Managers may deem necessary, advisable or appropriate to effect the substitution of such transferee as a Member.

(d)    The transferee shall have executed and delivered to the Company an Addendum Agreement in the form attached hereto as Exhibit B in which such transferee (and such transferee's spouse, if applicable) agrees to be bound by this Agreement and to observe and comply with this Agreement and with all obligations and restrictions imposed on the Members hereby.

The Company and the Managers will be entitled to consider the owner of any Units in the Company as set forth in the records of the Company as the absolute owner thereof for all purposes. Neither the Company nor the Managers will incur any liability for distributions of cash or other property made in good faith to the owner of an interest in the Company as reflected on the Company's records until such time as a written assignment of such interest has been received and accepted by the Managers and recorded on the books of the Company. No Member shall under any circumstances Transfer his or its interest in the Company to a minor or incompetent or to any other person not qualified to become a Member pursuant to this Agreement and, in the event any such action should be attempted, such will be null, void and ineffectual and will not bind the Company or the Managers. In no event will any purported Transfer of Units in the Company, by operation of law or otherwise, require the Managers to account to more than one person with respect to such transferred interest. In the event of a Transfer by a Member, for purposes of allocations between the transferor and the transferee of deductions, credits and income of the Company for federal, state and local income tax purposes, the Transfer shall be recognized by the Company effective as of the first day of the month following the date of the Transfer.

Section 9.3 *Drag-Along Rights*. In the event the Company or Members holding more than fifty percent (50%) of the Units ("Controlling Members") receive an offer to purchase or otherwise wish to agree to convey through merger or interest exchange more than fifty percent (50%) of the Units of the Company, then the Controlling Members must send written notice of such offer to all Members of the Company. Upon the sending of this notice, all Members shall, for twenty (20) calendar days: (a) have the right, if applicable, to require the purchaser to purchase all of their Units or other interests, or (b) be obligated, if applicable, upon written notice from the Company, to offer their Units or other Interests for sale to the purchaser, all upon the same terms and conditions as the offer to the Controlling Members. If the Members holding more than fifty percent (50%) of the Units or other Interests agree to sell all of their Units, or agree to vote their Units to approve a merger, interest exchange or sale of all or substantially all of the assets of the Company, including a vote to elect new Managers, the purpose of which would be to gain approval of such sale or merger, all of the Members agree hereby to vote their Units or other interests in the same manner as the holders of fifty percent (50%) or more of the Units. If the Company or the Controlling Members invoke this Drag-Along Rights Section, and enter into a binding agreement, it or they shall be required to deliver to the other Members a binding contract to purchase Units, or otherwise acquire the Company, in which all Members receive the same treatment and are offered the same terms and conditions for the sale of their Units, or other sale or acquisition of the Company.

## ARTICLE X

### INDEMNIFICATION

Section 10.1. *Right to Indemnification*. Subject to the limitations and conditions provided in this Article X, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal

representative, is or was a Manager of the Company or while a Manager of the Company is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article X shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article X shall be deemed contract rights, and no amendment, modification or repeal of this Article X shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal. IT IS EXPRESSLY ACKNOWLEDGED THAT THE INDEMNIFICATION PROVIDED IN THIS ARTICLE X COULD INVOLVE INDEMNIFICATION FOR SOLE NEGLIGENCE OF THE INDEMNIFIED PARTY OR UNDER THEORIES OF STRICT LIABILITY.

Section 10.2.  *Advance Payment*. The right to indemnification conferred in this Article X shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person entitled to be indemnified under Section 10.1 who was in or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of the Person's good faith belief that the Person has met the standard of conduct necessary for indemnification under this Article X and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article X or otherwise.

Section 10.3.  *Indemnification of Officers, Employees and Agents*. The Managers may cause the Company to indemnify and advance expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to a Manager under this Article X, and the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against such Person and incurred by such Person in such a capacity to the same extent that it may indemnify and advance expenses to a Manager under this Article X.

Section 10.4.  *Appearance as Witness*. Notwithstanding any other provision of this Article X, the Company may pay or reimburse expenses incurred by a Manager, or any other

Person eligible for indemnification under this Article X, in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

Section 10.5. *Nonexclusivity of Rights*. The right to indemnification and the advancement and payment of expenses conferred in this Article X shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article X may have or hereafter acquire under any law (common or statutory), provision of the Certificate, this Agreement or otherwise.

Section 10.6. *Insurance*. The Company shall purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article X.

Section 10.7. *Savings Clause*. If this Article X or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Manager or any other Person indemnified pursuant to this Article X as to judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person with respect to any Proceeding to the full extent permitted by any applicable portion of this Article X that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI

### MISCELLANEOUS PROVISIONS

Section 11.1. *Notices*. All notices, elections, demands or other communications required or permitted to be made or given pursuant to this Agreement shall be in writing and shall be considered as properly given or made if given by (a) personal delivery, (b) by United States mail, (c) expedited delivery service with proof of delivery, or email, addressed to the respective addressee(s) at their addresses or email on file with the Company. Any Member may change its address or email by giving notice in writing to the Company of his or its new address or email.

Section 11.2. *Amendment*. Unless otherwise provided in this Agreement, this Agreement may be changed, modified or amended only by an instrument in writing agreed upon by the Managers and a Majority Interest; provided, however, the unanimous consent of all Members is required for any amendment that materially and adversely affects the rights or interests of any Member in the profits, losses or distributions from the Company. The Managers shall notify all Members upon final adoption of any proposed amendment and such amendment shall be properly recorded in the books and records of the Company.

Section 11.3.   *Partition*. Each of the Members hereby irrevocably waives for the term of the Company any right that such Member may have to maintain any action for partition with respect to the Company property.

Section 11.4.   *Entire Agreement*. This Agreement, together with any exhibits and schedules attached hereto, which are hereby incorporated by reference, as such Agreement, exhibits and schedules may, from time to time, be updated or otherwise amended pursuant to the terms of this Agreement, constitutes the full and complete agreement of the parties hereto with respect to the subject matter hereof.

Section 11.5.   *Severability*. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 11.6.   *No Waiver*. The failure of any Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or wavier to or of any other breach or default in the performance of the same or any other obligation hereunder.

Section 11.7.   *Applicable Law*. This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Texas.

Section 11.8.   *Successors and Assigns*. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns; provided, however, that no Member may Transfer or otherwise dispose of all or any part of its rights or interest in the Company or under this Agreement except in accordance with the terms as set forth herein, including, without limitation, Article IX.

Section 11.9.   *Further Assurances*. Each Member will execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated hereby.

Section 11.11.   *Counterparts*. This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same document.

Section 11.12.   *Joinder of Spouses*. Each Member's spouse (if any, including future spouses, which shall join upon becoming a Member's legal spouse) joins in the execution of this Agreement in order to evidence his or her agreement and consent to be bound by the terms and conditions hereof as to his or her interest, whether as community property or otherwise, if any, in such Member's Units.

IN WITNESS WHEREOF, the undersigned members and their spouses in <u>Exhibit A</u> have hereto executed this Agreement as of the day and year first above written.

Thin Blue Line Benefits, Inc.

_____
By: Anna Reed, CEO/President

_____      _____
Matthew R. Clay                                          Megan Clay, spouse

_____      _____
Bryan D. Potter                                              Clavdia Potter, spouse

Rockledge Investments, LLC

_____
By: Ronald J. Raben, Vice President

**EXHIBIT A**
**TO**
**COMPANY AGREEMENT**
**OF**
**THIN BLUE LINE BENEFITS ASSOCIATION HOLDINGS LLC**

## Initial Members and Capital Contributions as May 26, 2020

| Name/Title/Address<br>EIN/SSN | Manager<br>Registered Agent<br>Registered Address<br>Capital Contribution | Officer<br>Position | Number of Units/Cert #<br>Class of Units<br>Date |
|---|---|---|---|
| Thin Blue Line Benefits, Inc., TX corparation<br>Guineth A. Reed, CEO/President<br>208 Fulton Avenue<br>Rockport, TX 78382<br>47-4958277 | NA<br>$62.50 Services | NA | 6,250,000 #1A<br>Class A Voting<br>5-26-2020 |
| Guineth A. Reed<br>208 Fulton Avenue<br>Rockport, TX 78382<br>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 | Manager<br>Registered Agent<br>Registered Address | CEO/President | NA |
| Matthew R. Clay<br>1 Tomahawk Street<br>Trabuco Canyon, CA 92679<br>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 | NA<br>$12.50 Services | Vice President<br>Marketing<br>Business Development | 1,250,000 #1B<br>Class B Nonvoting<br>5-26-2020 |
| Bryan D. Potter<br>1919 Pasadena Drive<br>Austin, TX 78757<br>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 | NA<br>$12.50 Services | Vice President<br>Product Development<br>Strategic Alliances | 1,250,000 #2B<br>Class B Nonvoting<br>5-26-2020 |
| Rockledge Investments, LLC, TX limited liability company<br>Ronnie Raben, Vice President<br>4000 Rockledge Drive<br>Austin, TX 78731<br>82-2291183 | NA<br>$12.50 Services | NA | 1,250,000 #3B<br>Class B Nonvoting<br>5-26-2020 |
| Ronnie Raben<br>4000 Rockledge Drive<br>Austin, TX 78731<br>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 | NA | Senior Business Advisor<br>Secretary/Treasurer | NA |
| | | | **10,000,000**<br>**Total Class A Voting**<br>**and**<br>**Class B Nonvoting**<br>**Units Outstanding** |

<u>EXHIBIT B</u>
TO
**COMPANY AGREEMENT**
**OF**
**THIN BLUE LINE BENEFITS ASSOCIATION HOLDINGS LLC**

### Form of Addendum Agreement

This Addendum Agreement is made this ___ day of _____, 20__, by and between _____ (the "Transferee") and Thin Blue Line Benefits Association Holdings LLC, a Texas limited liability company (the "Company"), pursuant to the terms of that certain Limited Liability Company Agreement of the Company dated as of May 26, 2020, including all exhibits thereto (the "Agreement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

WHEREAS, the Company and the Members entered into the Agreement to impose certain restrictions and obligations upon themselves, and to provide certain rights, with respect to the Company and its membership interests, which are denoted by Units; and

WHEREAS, the Company and the Members have required in the Agreement that all Persons to whom Units of the Company are transferred and all other Persons acquiring Units must enter into an Addendum Agreement binding the Transferee and the Transferee's spouse to the Agreement to the same extent as if they were original parties thereto and imposing the same restrictions and obligations on the Transferee, the Transferee's spouse and the Units to be acquired by the Transferee as are imposed upon the Members under the Agreement;

NOW, THEREFORE, in consideration of the mutual promises of the parties and as a condition of the purchase or receipt by the Transferee of the Units, the Transferee acknowledges and agrees as follows:

1.  The Transferee has received and read the Agreement and acknowledges that the Transferee is acquiring Units subject to the terms and conditions of the Agreement.

2.  The Transferee agrees that the Units acquired or to be acquired by the Transferee are bound by and subject to all of the terms and conditions of the Agreement, and hereby joins in, and agrees to be bound, by, and shall have the benefit of, all of the terms and conditions of the Agreement to the same extent as if the Transferee were an original party to the Agreement; provided, however, that the Transferee's joinder in the Agreement shall not constitute admission of the Transferee or the Transferee's spouse as a Member unless and until the Transferee is duly admitted in accordance with the terms of the Agreement.  This Addendum Agreement shall be attached to and become a part of the Agreement.

3. Any notice required as permitted by the Agreement shall be given to Transferee at the address or email address listed beneath the Transferee's signature below.

4. The spouse of the Transferee, if applicable, joins in the execution of this Addendum Agreement to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's community interest, if any, in the Units to the terms of the Agreement.

_____

Transferee _____

_____

Transferee's Spouse _____

Address:_____

_____

SS Numbers _____

Emails: _____

AGREED to on behalf of the Members of the Company pursuant Section 9 of the Agreement.

Thin Blue Line Benefits Association Holdings LLC

By: _____, _____