## REDEMPTION AND WITHDRAWAL AGREEMENT

THIS REDEMPTION AND WITHDRAWAL AGREEMENT (this "Agreement") is made and entered as of June 21, 2024 (the "Signing Date") with a date of transfer and effectiveness as of August 1, 2024 (the "Effective Date"), by and among THIN BLUE LINE BENEFITS ASSOCIATION HOLDINGS, LLC, a Texas limited liability company (the "Company") and MATTHEW CLAY ("Withdrawing Member") and ANNA REED and ROBERT ANDERSON (each and collectively the "Remaining Members").  This Agreement is entered into with reference to the following facts and circumstances.

### RECITALS

A.  As of the drafting of this Agreement, the Withdrawing Member owns a 37% ownership interest in the Company.

B.  As of August 1, 2024, upon mutual consent of the Company, Withdrawing Member, and Remaining Members, the Company has agreed to purchase and redeem Withdrawing Member's Membership Interest in accordance with the terms of this Agreement.

C.  The Company, the Withdrawing Member, and the Remaining Members now desire to enter into this Agreement to provide for (i) the full and complete redemption of the Withdrawing Member's Membership Interest in the Company, and (ii) such other matters as are agreed to by the Company and the Withdrawing Member.

### AGREEMENT

NOW THEREFORE, in consideration of the foregoing and of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1.  **Withdrawal/Redemption of the Membership Interest.**  Pursuant to the terms and conditions set forth in this Agreement, the Withdrawing Member hereby irrevocably and unconditionally withdraws as a member of the Company and the Company hereby redeems each Withdrawing Member's entire "Membership Interest" (as further defined in this Section 1) in the Company provided the foregoing shall not limit or modify the rights of the Withdrawing Member under Section 2(c) below.  For purposes of this Agreement, the Withdrawing Member's "Membership Interest" includes, without limitation, all of the Withdrawing Member's right, title and interest in and to and claims against the Company (including, without limitation, any claims released under Section 7(a) below), any management, voting or other rights under any organizational and operational agreement, any right to return of the Withdrawing Member's capital and any yield or return thereon, rights to distributions or allocations of income, profits, credits, losses or deductions, and claims for payment of any fees, debts (including, without limitation, any right to treat the Withdrawing Member's unreturned Capital Contribution) or reimbursement or payment of any other amounts together with any interest thereon owing now or in the future by the Company to the Withdrawing Member and any right, title or interest in or to purchase or acquire any property of the Company.  On the Effective Date, the following actions shall occur concurrently: (a) the Company will redeem in full each Withdrawing Member's Membership

Interest, and (b) each Withdrawing Member will irrevocably and unconditionally withdraw from the Company (collectively, the "Transaction").

2. **Consideration.**

(a) **Consideration.**

(1) **Signature Plan.** The Company shall provide to Withdrawing Member the Company's Signature Plan, as defined herein. The Signature Plan is a custom designed and implemented healthcare plan package developed by Benefit Strategies, LLC, and identified as group number 21502. Benefit Strategies receives and will continue to receive its royalty from Align Health Partners, related to the Signature Plan and will remain in place. That agreement is not between the withdrawing member and Benefit Strategies.

The Signature Plan consists of the following components:

(1) the major medical costs share with Zion Health share, and administered by Align Health Partners;

(2) the minimum essential coverage for ACA compliant preventative care and office visits administered through Kentucky Health Administrators and overseen by Quilt Benefits, and contracted with Cigna health providers network;

(3) prescription coverage administered by Kentucky Health Administrators and contracted through Orchestra Rx;

(4) Align health to manage the online enrollment and premium collection through Insynctive and Zion Health share; and

(5) The current member/policyholder contracts, vendors, and services provided under the Signature Plan.

The Signature Plan's vendors and plan compensations to those vendors will remain the same through December 31, 2024; however, the Withdrawing Member is free to make any changes in vendors to be implemented January 1, 2025.

In an effort to assist Withdrawing Member with the Signature Plan to be able to be marketed and sold, the Company shall allow Signature Plan to remain under the umbrella of the Company for a period of time not to exceed 12 months from the date of full ownership, January 1, 2025, as it is already filed and approved as an association in the state of Texas. The provisions of this paragraph shall remain in effect until such time that Withdrawing Member successfully establishes a separate association, no later than December 31, 2025, whichever comes first. Additionally, the company will assist Withdrawing Member in creating an entity in which Signature can be housed in order to be filed and recognized by the State of Texas, prior to renewal for the January 2025 plan year. Withdrawing Member assumes full responsibility for the actual filing and any associated fees.

The Withdrawing Member shall have all ownership over the plan, marketing and selling of the Signature Plan; however, may not do so on the Company's website. The Withdrawing Member

assumes any and all liability associated with the operations and viability of the Signature Plan indefinitely and is the sole responsible party as to any issues associated with the plan and its policyholders, with exception to the agreement regarding the payment of claims as set forth below. The Company assumes no responsibility for any material claims or judgments made against the plan or its management after the Effective Date.

(2)    **Independent Contractor Agreement.**    The Company shall contract with Withdrawing Member as an independent contractor for a period of not less than twelve (12) months effective August 1, 2024 and pursuant to the Independent Contractor Agreement set forth in **Exhibit A**.

(3)    **Signature Plan Loan.**    In 2023, the Company's PPO loaned money to the Signature Plan. The Company will assume the balance of the loan and the Signature Plan will transfer without any balance due to the Company.

(4)    **Other Commissions.**    Before the Effective Date, the Withdrawing Member will continue to be paid his 37% broker commissions on the Signature Plan as usual and customary with no reduction in the overall commissionable rate and the Company's PPO Plans for the months of May, June, and July as usual and customary with no reduction in overall commissionable rate. After the Effective Date, the Withdrawing Member will receive 100% broker commissions on the Signature Plan.

After the Effective Date, Withdrawing Member will receive his 50% broker commissions from MetLife, paid on or about the 25th of the month through December 31, 2024. After the Effective Date, Withdrawing Member will receive 100% of the broker commissions from the MetLife Dental/Vision for enrolled Signature Plan members, paid directly by Anna Reed, and through December 31, 2024.

Withdrawing Member has worked during 2024 with union leaders in Washington and Oregon states and the National FOP executives outside the normal scope of his duties to establish the opportunity to create active employee healthcare for 2025 and beyond, as future groups join the plan(s). Company shall compensate Withdrawing Member a broker commission of 3% for business from these plans in Washington and Oregon.

(b)    **Non-Responsibility of the Remaining Members and the Company.**    For the avoidance of any doubt, the Transaction shall remain in full force and effect and shall not be subject to rescission, set aside, or any similar claim or remedy by the Withdrawing Member, all of which rights and remedies are hereby irrevocably and unconditionally waived by the Withdrawing Member and shall be considered as having been released pursuant to the Withdrawing Member's Release (provided for in Section 7(a) below).

(c)    **Survival of Indemnification Provisions.**    Notwithstanding the Transaction (or any other provision set forth in this Agreement), the indemnification and other provisions provide by the Company for the benefit of the Withdrawing Member shall survive the Withdrawing Member's withdrawal from the Company with respect to any claim that arises on or prior to the Effective Date (an "Indemnifiable Claim"); provided however that such indemnification and other

3

provisions shall not cover any breach by a Withdrawing Member of this Agreement, and provided further that each Withdrawing Member's rights shall be subject to the express terms and limitations contained therein.  Except as provided above in this Section 2(c), a Withdrawing Member no longer possesses or retains its respective Membership Interest or any other right, title or interest in or to or claims against the Company.  Except as otherwise provided in this Agreement, a Withdrawing Member has no further duties, liabilities and/or obligations to the Company or the Remaining Members with respect to its Membership Interest.

3.      **Representations and Warranties.**

   **(a)    Withdrawing Member's Representations and Warranties.**  The Withdrawing Member makes the following representations and warranties to the Company as of the Effective Date:

   (i)    The Withdrawing Member has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  This Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of each Withdrawing Member, no further consent or approval is required, and this Agreement constitutes the legal, valid and binding obligation of the Withdrawing Member, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other laws relating to or affecting enforcement of creditor's rights generally or by general equity principles.

   (ii)    The execution, delivery and performance of this Agreement does not, and the performance of this Agreement will not violate any existing applicable law, rule, regulation, judgment, order or decree of any governmental instrumentality or court having jurisdiction over Withdrawing Member.

   (iii)    The execution, delivery and performance of this Agreement, the Transaction and any other transactions contemplated hereby do not conflict, and are not inconsistent, with and will not result (with or without the giving of notice or passage of time or both) in a breach of or creation of any lien, charge or encumbrance upon any of a Withdrawing Member's Membership Interest pursuant to the terms of any credit agreement, indenture, lease, guarantee or other instrument to which a Withdrawing Member is a party or by which a Withdrawing Member may be bound or to which it may be subject.

   (iv)    Excepting Withdrawing Member Unreleased Claims (defined below), from and after the Effective Date, the Withdrawing Member shall not have any right, title or interest in or to or claim against the Company, including, without limitation, any right, title or interest in or to or against any cash flow or any other distributions, capital, profits and losses, management, voting or other rights under any organizational and operational agreement, or any rights to any receivables (including, without limitation, any right to such Withdrawing Member's unreturned Capital Contribution) relating to the Company, including but not limited to, member loans, voluntary loans, payment of fees, repayment of any loan or any other such receivables or any right, title or interest in or to purchase or acquire any property of the Company.

4

(v) The Withdrawing Member hereby represents and warrants that he is the owner of the Withdrawing Member Claims and that neither Withdrawing Member has previously assigned or transferred any of the Withdrawing Member Claims.

(vi) The Withdrawing Member hereby acknowledges and understands that (i) the Company and the Remaining Members intend to carry on with the business of the Company, (ii) such Withdrawing Member has been provided with due opportunity to inquire regarding the ongoing and future prospects of the business and affairs of the Company, and (iii) the Company and its Remaining Members have no affirmative duty to disclose or other duty (including, without limitation, any fiduciary duty) regarding the ongoing and future business and affairs of the Company (including, without limitation, any potential opportunities, profits or earnings which such Withdrawing Member may be foregoing by withdrawing from the Company pursuant to this Agreement) to such Withdrawing Member however such duty might arise by contract, law or otherwise.  Each Withdrawing Member hereby waives all rights it may have against the Company, its assets or the Remaining Members in connection with the duties and obligations described in the foregoing subsections.  **From the Signing Date to the Effective Date, Withdrawing Member shall waive his right to participate in any management decisions, meetings, or other business of the Company.**

(vii) For the avoidance of doubt, any and all claims submitted under the Signature Plan with a date of service after December 31, 2024 shall be the responsibility of the Withdrawing Member**.**

**(b)** **Company's Representations and Warranties.**  The Company hereby represents and warrants to each Withdrawing Member as of the Effective Date as follows:

(i) The Company is a limited liability company duly organized and validly existing under the laws of the state of Texas, with all requisite power to carry on its business as presently owned or conducted and to take any action contemplated by it pursuant to this Agreement.

(ii) The Company has full power and authority to enter into this Agreement and to consummate the Transaction and any other transactions contemplated hereby.  This Agreement and the consummation of the Transaction and any other transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company, no further consent or approval is required from the Remaining Members or any other Person except for such consents or approval being obtained prior to the Effective Date and all such consents and approvals have been obtained as of the Effective Date, and this Agreement constitutes the legal, valid and binding obligation of the Company enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other laws relating to or affecting enforcement of creditor's rights generally or by general equity principles.

(iii) The execution, delivery and performance of this Agreement does not, and the performance of this Agreement as of the Effective Date will not: (1) violate the

5

organizational documents of the Company; (2) violate any existing applicable law, rule, regulation, judgment, order or decree of any governmental instrumentality or court having jurisdiction over the Company, or (3) require the Company to obtain any authorization, consent, approval or waiver from, or to make any filing with, any governmental body or authority except for such consents or approval being obtained prior to the Effective Date and all such consents and approvals have been obtained as of the Effective Date.

(iv)     The execution, delivery and performance of this Agreement, the Transaction and any other transactions contemplated hereby as of the Effective Date do not conflict and are not inconsistent with, and will not result (with or without the giving of notice or passage of time or both) in a breach of any credit agreement, indenture, lease, guarantee or other instrument to which the Company is a party or by which the Company may be bound or to which it may be subject.

(v)     Any and all third party consents or approvals necessary for the performance of this Agreement and the transactions contemplated hereby, including without limitation, the Approval from the Remaining Members, has been obtained as of the Effective Date.

(vi)     The Company agrees to participate in the transfer of the Signature Plan to Withdrawing Member. Policyholder communications and the communications with all vendors shall fall under the management and oversight of the Withdrawing Member until January 1, 2025 at which time, all member/policyholder and vendor communications will lie solely with the Withdrawing Member and at the full discretion of the Withdrawing Member. Care navigation services to Signature members, however, will be provided by the company through December, 2024.

(vii)     For the avoidance of doubt, all claims submitted under the Signature Plan with a date of service prior to January 1, 2025 shall be the responsibility of the Company. Regular significant payments toward the total claims balance shall be paid monthly from the date of the signing of this agreement through December 31, 2024 to ensure that 100% of existing claims on Signature are paid in full no later than December 31, 2024. In the interim, all claims must be kept paid-up within 90 days from service dates.

(c)     **Survival.**  Each of the representations and warranties of the Company and the Withdrawing Member set forth in this Section 3 shall expire if a claim has not been commenced against the applicable party with respect to a breach of a representation or warranty within two (2) years from the Effective Date.

4.     **Company Acknowledgment.**  As a material inducement to the Withdrawing Member to enter into this Agreement, the Company hereby acknowledges and agrees that:

(a)     **AS-IS ACQUISITION.**  EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THE COMPANY IS REDEEMING AND ACQUIRING EACH WITHDRAWING MEMBER'S MEMBERSHIP INTEREST IN THE COMPANY ON AN "AS-IS/WHERE-IS" AND "WITH ALL FAULTS AND DEFECTS" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY OF EITHER WITHDRAWING MEMBER (OR ANY

AFFILIATE OR REPRESENTATIVE OF EITHER WITHDRAWING MEMBER), EXPRESS, IMPLIED OR STATUTORY, AS TO SUCH MEMBERSHIP INTEREST, THE COMPANY, OR THE NATURE OR CONDITION OF OR TITLE TO ALL OR ANY OF THE ASSETS OF THE COMPANY.

**(b)     No Representations.**  Other than the express representations, warranties, agreements and covenants of the Withdrawing Member as set forth in this Agreement, neither the Withdrawing Member, nor any Person acting by or on behalf of either of such Withdrawing Member, has made any representation, warranty, inducement, promise, agreement, assurance or statement, oral or written, of any kind to the Company or to the Remaining Members upon which the Company or any such Remaining Members are relying, or in connection with which the Company or any such Remaining Members have made or will make any decision concerning either Withdrawing Member's Membership Interest, the Company, the Agreement, the liabilities of the Company and/or the assets of the Company.

**5.     Management and Membership Rights.**  On the Effective Date, the Withdrawing Member's management, membership, voting, approval or other similar rights with respect to the Company shall have been irrevocably and unconditionally terminated.

**6.     Deliveries and Transaction Costs.**

**(a)     Withdrawing Member's Deliveries.**  At or before the Effective Date, the Withdrawing Member shall deliver to the Company the following:

(i)     This Agreement and Exhibit thereto, duly executed by the Withdrawing Member;

(ii)     any tangible or intangible assets of the Company; and

(iii)     such resolutions, authorizations, or other corporate and/or limited liability company documents or agreements relating to such Withdrawing Member and the Company as shall be reasonably requested by the Company.

**(b)     The Company's Deliveries.**  At or before the Effective Date, the Company shall deliver to each Withdrawing Member the following:

(i)     This Agreement and Exhibit thereto, duly executed by the Company;

(ii)     the Signature Plan, including but not limited to all Signature Plan documents, related agreements, vendor contracts, and Signature member census and data.

(iii)     such resolutions, authorization, or other corporate and/or limited liability company documents or agreements relating to the Company and the Withdrawing Member as shall be reasonably requested by the Withdrawing Member.

**(c)     Transaction Costs.**  Each of the parties shall be responsible for the payment of its own out-of-pocket costs, including attorneys' fees, incurred in connection with this Agreement, whether consummated or not.

7. **Releases.**

(a) As of the Effective Date, the Withdrawing Member, for himself, his entity ( LLC) and his affiliates, partners, directors, members, owners, managers, officers, employees and agents (individually, a "Withdrawing Member Releasing Party"), hereby releases and discharges (the "Withdrawing Member Release") the Company, each of their respective affiliates, and each of their respective partners, directors, members, owners, managers, officers, employees and agents (collectively, "Company Releasees") from all causes of action, actions, debts, sums of money, accounts, bonds, bills, covenants, contracts, controversies, promises, agreements, trespasses, variances, judgments, damages, executions, claims, demands, whatsoever, in law or equity, which any Withdrawing Member Releasing Party has ever had or may have in the future against any Company Releasee, by reason of any matter, cause or thing whatsoever accruing or arising from the beginning of time to the Effective Date with respect to the Company (collectively, the "Withdrawing Member Claims"); provided, however, that this Withdrawing Member Release shall not extend to any Withdrawing Member Claims against any Company Releasee arising out of any breach by any such Company Releasee of any of its obligations or representations and warranties expressly set forth in this Agreement (the "Withdrawing Member Unreleased Claims").

It is the intention of the Withdrawing Member Releasing Parties that the release under Section 7(a), with the exception of the Withdrawing Member Unreleased Claims, be effective as a bar to each of the Withdrawing Member Claims hereinabove specified. The Withdrawing Member Releasing Party understands, acknowledges, and agrees that no Withdrawing Member Unknown Claims (as hereinafter defined), or any facts, events, circumstances, evidence or transactions which could now be asserted or which may hereafter be discovered, shall affect the final, absolute and unconditional nature of the release under Section 7(a). For purposes of this Agreement, "Withdrawing Member Unknown Claims" means any and all Withdrawing Member Claims (except for the Withdrawing Member Unreleased Claims) that a Withdrawing Member Releasing Party does not know or suspect to exist in her favor at the time of the effectiveness of the release under Section 7(a), which if known by such Withdrawing Member Releasing Party would have affected his, her or its decision to give the Withdrawing Member Release provided for herein. With respect to any and all Withdrawing Member Claims, except for Withdrawing Member Unreleased Claims, each of the Withdrawing Member Releasing Parties agrees that upon the Effective Date, each Withdrawing Member Releasing Party shall be deemed to have, and shall have, knowingly and expressly waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or any other state, sovereign or jurisdiction, or principle of common law which is similar, comparable, or equivalent to California Civil Code Section 1542 which provides:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF**

EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(b) As of the Effective Date, the Company, for itself and its affiliates, directors, members (exclusive of the Remaining Members), owners, managers, officers, employees and agents (a "Company Releasing Party"), hereby releases and discharges (the "Company Release") the Withdrawing Member, her respective affiliates, and their respective partners, directors, members, owners, managers, officers, employees and agents (collectively, as to each Withdrawing Member, the "Withdrawing Member Releasees") from all causes of action, actions, debts, sums of money, accounts, bonds, bills, covenants, contracts, controversies, promises, agreements, trespasses, variances, judgments, damages, executions, claims, demands, whatsoever, in law or equity, which any Company Releasing Party, individually or collectively, has, ever had or may have in the future against any Withdrawing Member Releasee, by reason of any matter, cause or thing whatsoever accruing or arising from the beginning of time to the Effective Date with respect to the Company (the "Company Claims"); provided, however, that this Company Release shall not extend to any Company Claims against a Withdrawing Member arising out of any breach by a Withdrawing Member of any of its obligations or representations and warranties expressly set forth in this Agreement (or any dispute regarding the interpretation or enforceability of this Agreement), or any Company Claims against a Withdrawing Member that the Company Releasing Parties may have in response to or defending against an indemnification claim that is not an Indemnifiable Claim made by the Withdrawing Member Releasees (the "Company Unreleased Claims").

It is the intention of the Company Releasing Parties that the release under this Section 7(b), with the exception of the Company Unreleased Claims, be effective as a bar to each of the Company Claims hereinabove specified. Each Company Releasing Party understands, acknowledges, and agrees that no Company Unknown Claims (as hereinafter defined), or any facts, events, circumstances, evidence or transactions which could now be asserted or which may hereafter be discovered, shall affect the final, absolute and unconditional nature of the release under this Section 7(b). For purposes of this Agreement, "Company Unknown Claims" means any and all Company Claims (except for the Company Unreleased Claims) that a Company Releasing Party does not know or suspect to exist in her or its favor at the time of the effectiveness of the release under this Section 7(b), which if known by such Company Releasing Party would have affected his, her or its decision to give the Company Release provided for herein. With respect to any and all Company Claims, each of the Company Releasing Parties agrees that upon the Effective Date, each Company Releasing Party shall be deemed to have, and shall have, knowingly and expressly waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or any other state, sovereign or jurisdiction, or principle of common law which is similar, comparable, or equivalent to California Civil Code Section 1542 which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

9

(c) EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES THAT IT HAS CAREFULLY REVIEWED THIS SECTION AND DISCUSSED ITS IMPORTANCE WITH INDEPENDENT LEGAL COUNSEL OF THEIR CHOOSING, OR HAVE HAD THE OPPORTUNITY TO DISCUSS THE IMPORTANCE WITH INDEPENDENT LEGAL COUNSEL OF THEIR CHOOSING, AND THAT THE PROVISIONS OF THIS SECTION ARE A MATERIAL PART OF THIS AGREEMENT.

Anna Reed, CEO
Thin Blue Line Benefits
Association Holdings, LLC

Matthew Clay, Withdrawing Member

Anna Reed, Remaining Member

Robert Anderson, Remaining Member

8. **Brokers And Finders.** No party has had any contact or dealings regarding or any communication in connection with the subject matter of this Agreement, through any broker or other person who can claim a right to a commission or finder's fee in connection with the transactions contemplated herein.

9. **Non-Competition.** Withdrawing Member agrees not to market or solicit the Signature Plan, or similar health cost-sharing plan, to the NFOP or to the IAFF for a period of thirty-six (36) months from the Effective Date. Further, Withdrawing Member agrees not to market or solicit a product that competes with the products offered by Company, to the NFOP or to the IAFF for a period of thirty-six (36) months from the Effective Date. For the avoidance of doubt, Withdrawing Member may continue relations with the NFOP and IAFF to fulfill the terms of the Independent Contractor Agreement as set forth in Exhibit A.

10. **Miscellaneous.**

(a) **Successors and Assigns.** This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, administrators and assigns. Neither the Company nor the Withdrawing Member shall assign any of their respective right, title or interest in or to this Agreement.

(b) **Amendments.** This Agreement may be amended or modified only by a written instrument executed by each Withdrawing Member and the Company.

(c) **Governing Law; Choice of Forum.** This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the internal laws of the State of Texas, without reference to the rules regarding conflict or choice of laws.

(d) **Interpretation.** The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation hereof. Whenever the

context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and the neuter, and vice versa. This Agreement shall not be construed against the Company or the Withdrawing Member but shall be construed as a whole, in accordance with its fair meaning, and as if prepared by the Company and the Withdrawing Member jointly.

(e) **No Obligation to Third Parties.** The execution and delivery of this Agreement shall not be deemed to confer any rights upon, nor obligate either of the parties hereto to, any person or entity not a party to this Agreement.

(f) **Further Assurances.** Each of the parties shall execute such other and further documents and do such further acts as may be reasonably required to effectuate the intent of the parties and carry out the terms of this Agreement. This provision shall survive the Effective Date.

(g) **Merger of Prior Agreements.** This Agreement and exhibits hereto constitute the entire agreement between the parties and supersedes all prior agreements and understandings between the parties relating to the subject matter hereof, including without limitation, any letter of intent or nonbinding proposal, which shall be of no further force or effect upon execution of this Agreement by the Company and the Withdrawing Member.

(h) **Enforcement.** The parties shall bear their own attorneys' fees and costs incurred in connection with the negotiation and execution of this Agreement. In the event a dispute arises concerning the performance, meaning or interpretation of any provision of this Agreement or any document executed in connection with this Agreement (including, without limitation, any dispute as to whether a Claim is an Indemnifiable Claim), the prevailing party in such dispute shall be awarded any and all costs and expenses incurred by the prevailing party in enforcing, defending or establishing its rights hereunder or thereunder, including, without limitation, court costs and reasonable attorneys and expert witness fees. In addition to the foregoing award of costs and fees, the prevailing party shall also be entitled to recover its reasonable attorneys' fees incurred in any post judgment proceedings to collect or enforce any judgment. This provision is separate and several and shall survive the Effective Date.

(i) **Time.** Time is of the essence of this Agreement. For purposes of this Agreement "business day" shall mean any day other than a Saturday and those days specified as a "holiday" in Section 7 of the California Civil Code. Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is not a business day, in which event the period shall run to and include the next day which is a business day.

(j) **Severability.** If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, then the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

(k) **No Waiver.** No delay or failure on the part of any party hereto in exercising any right, power or privilege under this Agreement or under any other instrument or document given

11

in connection with or pursuant to this Agreement shall impair any such right, power or privilege or be construed as a waiver of any default or any acquiescence therein. No single or partial exercise of any such right, power or privilege shall preclude the further exercise of such right, power or privilege. No waiver shall be valid against any party hereto unless made in writing and executed by the party against whom enforcement of such waiver is sought and then only to the extent expressly specified therein.

**(l)** **No Offer or Binding Contract.** The parties hereto agree that the submission of an unexecuted copy or counterpart of this Agreement by one party to another is not intended by either party to be, or be deemed to be a legally binding contract or an offer to enter into a legally binding contract. The parties shall be legally bound pursuant to the terms of this Agreement only if and when the parties have been able to negotiate all of the terms and provisions of this Agreement in a manner acceptable to each of the parties in their respective sole discretion, and the Withdrawing Member and the Company have fully executed and delivered this Agreement.

**(m)** **Counterparts.** This Agreement, and any document executed in connection with this Agreement, may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all parties had signed the same signature page.

**(n)** **Notices.** Notices or other communications shall be transmitted by e-mail, with a telephone or written receipt by the addressee or the addressee's agent. All notices and other communications shall be deemed received by the addressee for all purposes of this Agreement on the date of the receipt for delivery (as provided in each case above).

To Withdrawing Member:

Matthew Clay
Email: claylabor@gmail.com

To the Company:

Thin Blue Line Benefits Association Holdings, LLC
Email: anna@thinbluelinebenefits.com

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

**[SIGNATURES FOLLOW ON NEXT PAGE]**

**[SIGNATURE PAGE]**

IN WITNESS WHEREOF, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the date below.

**COMPANY:**

Dated: 7/2/2024

*/s/ Anna Reed* (DocuSigned)
Anna Reed, CEO
Thin Blue Line Benefits Association Holdings, LLC
& Remaining Member

**COMPANY:**

Dated: 7/2/2024

*/s/ Robert Anderson* (DocuSigned)
Robert Anderson, Vice President
Thin Blue Line Benefits Association Holdings, LLC
& Remaining Member

**WITHDRAWING MEMBER:**

Dated: 7/2/2024

*/s/ Matthew Clay* (DocuSigned)
Matthew Clay

EXHIBIT A

INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (this "Agreement") between Thin Blue Line Benefits Association Holdings, LLC, a Texas limited liability company ("Company") and Matthew Clay ("Contractor") effective as of August 1, 2024 (the "Effective Date").

WHEREAS, Contractor has agreed to act as an independent contractor in accordance with the terms and conditions set out herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Independent Contractor.**

(a) Contractor agrees to provide to Company the services as set forth in the attached Exhibit 1 ("Services") in a professional and workmanlike manner. Contractor shall be an independent contractor with respect to Company. No specific hours of duty shall be required of Contractor by Company. Contractor will not be directly supervised in the manner or timing of the Services to be rendered but shall be held to a standard overall performance set by Company. This Agreement shall not render Contractor an employee, partner, agent of, or joint venturer with Company for any purpose, nor shall Contractor hold itself out as such for any purpose. Contractor understands and acknowledges that no tax withholding, workers' compensation coverage, unemployment insurance coverage or other benefits normally associated with an employer-employee relationship will be provided by Company, and Contractor shall be solely responsible for any tax payments, benefits or coverage.

(b) Company and Contractor both affirm the following: (i) Contractor is free from direct control and direction of Company under this Agreement, barring the setting of goals and milestones for projects; (ii) the work being performed under this Agreement is outside the usual course of business of Company; and (iii) Contractor customarily and in fact engages in an independently established trade or business of the same nature as the work outlined in Exhibit 1 to this Agreement; and (4) all of the foregoing is true and correct as of the date of the signing of this agreement.

2. **Work Made for Hire.** The Services provided by Contractor under this Agreement shall be a work made for hire, and Contractor understands and agrees that Company shall own solely and exclusively the results, proceeds, products and all collateral elements thereto, including all work product of Contractor rendered under this Agreement and all intellectual property contained therein (collectively, the "Material"). The rights herein granted include the right to distribute, transmit, exhibit, broadcast and otherwise exploit all works produced pursuant to the rights granted hereunder by means of any and all media and devices whether now known or hereafter devised, and in any and all markets whatsoever, as well as the right of Company in its discretion to make any and all changes in, additions to and deletions from the Material, as well as the right to use, in a reasonable and customary manner, your name, likeness and biography in and in connection with the exploitation of the rights granted hereunder; provided, that in no event shall your name,

likeness and/or biography be used hereunder to endorse any product, service, individual or entity, or other than in connection with the exploitation of the rights granted hereunder. Nothing contained in this Agreement shall be construed as requiring Company to exercise or exploit any of the Rights granted to Company hereunder. Contractor agrees that Company shall have the unlimited right to vary, change, alter, modify, add to and/or delete from all or any part of the Material (including without limitation the title or titles thereto), and to rearrange and/or transpose all or any part of the Material and change the sequence thereof and the characters and descriptions of the characters contained in the Material and to use a portion or portions of the Material in conjunction with any other literary, dramatic or other material of any kind. Contractor hereby waives the benefits of any provision of law known as "droit moral" or any similar law in any and all countries and other jurisdictions of the universe.

3. **Assignment.** This Agreement is a professional services agreement and Contractor shall not have the right to assign this Agreement or delegate any work to be performed hereunder without the prior written consent of Company.

4. **Payment.** Company agrees to pay Contractor as per the rate and terms set forth in Exhibit 1 and reimburse all reasonable expenses approved in writing by Company.

5. **Non-exclusivity.** This Agreement is a non-exclusive agreement, and both parties remain free to enter into similar agreements with third parties, provided that Contractor may not enter into such agreements if performance under such agreements would impair its ability to perform its duties to Company.

6. **Warranties.**

(a) Contractor warrants that (i) all materials delivered under this Agreement will not violate or infringe any contractual, intellectual property, proprietary, moral or other right of any third party; (ii) any deliverables containing third-party materials (e.g., software, content), shall include a license to such materials for the benefit of Company to the extent licenses are needed to access third-party materials;

(b) Each party represents and warrants that it has the full right, power, legal capacity, and authority to enter into, deliver and fully perform under this Agreement.

(c) Each party shall defend, indemnify, and hold the other harmless from and against any third party claims, loss, cost or damage suffered (including reasonable attorneys' fees and costs) arising out of its performance or non-performance under this Agreement or any breach of the Agreement or these warranties.

7. **Confidentiality.** Contractor agrees that any (i) nonpublic information acquired during the performance of the Services; (ii) the finances and business affairs of Company; (iii) all information and specifications relating to Contractor's provision of the Services, or (iv) any information designated (orally or in writing) as proprietary or confidential information constitutes confidential information and agrees not to disclose such matter to anyone unless consented to in writing by Company. Contractor agrees that a breach or threatened breach of this provision would cause irreparable harm to Company. During the term of this contract and for two (2) years thereafter,

Contractor may not contact or solicit any Company client for which Contractor rendered services or which Contractor learned of as part of its performance of this Agreement without prior written consent from Company.

**8.** **Limitation of Liability.** To the extent allowed by applicable law, in no event shall either party, its members, suppliers or clients be liable for (i) any indirect or consequential loss, damage, costs or expense of any kind whatsoever and howsoever caused, whether arising under contract, tort, negligence, statute or otherwise, including, (without limitation) loss of production, loss of or corruption to data, loss of profits or of contracts, loss of operation time and loss of goodwill or anticipated savings, even if advised of their possibility; or (ii) any representation or warranty made to any third party by either party. It is further acknowledged and agreed that neither the failure to accord Contractor credit nor any other breach of this Agreement shall entitle Contractor to equitable relief, whether injunctive or otherwise, against or with respect to the Services, Materials or any other works produced pursuant to the rights granted hereunder or their exploitation, since Contractor's remedy of money damages at law is adequate. In no event shall Contractor's total liability to Company exceed the amount paid by Company to Contractor under this Agreement.

**9.** **Termination.** This Agreement shall terminate no less than twelve (12) months from the Effective Date. Company may not terminate contract without full remuneration of the full term. In the event of non-payment, Contractor shall provide Company with ten (10) days to correct the default in payment. If payment is not made, Contractor may terminate the contract. If the event Contractor is not able to perform the Agreement due to death or disability, the remaining payment due by Contractor shall be adjusted on a pro-rata basis to compensate Contractor through the date of termination. All provisions of Agreement that impose obligations that are continuing in their nature shall survive termination of this Agreement.

**10.** **General.**

(a) This Agreement, including the attached Exhibit, constitutes the entire agreement between the parties with respect to the subject matter hereof and replaces any prior understandings, written or oral. This Agreement may not be modified except by a written instrument signed by both parties. Failure by either party to enforce any provision of this Agreement will not be deemed a waiver or future enforcement of that or any other provision.

(b) This Agreement shall be governed by the laws of the State of California without reference to its conflict of laws principles.

(c) The prevailing party in any action or proceeding to enforce its rights hereunder shall be entitled to recover reasonable attorneys' fees and other reasonable costs, incurred in the action or proceedings.

(d) All notices and demands hereunder shall be in writing and shall be served by personal service, overnight delivery service, facsimile, or by e-mail at the address of the receiving party set forth above (or at such different address as may be designated by such party by written notice to the other party) and shall be deemed complete upon receipt.

(e)     Nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, earthquake, governmental acts, orders or restrictions, or any other reason where failure to perform is beyond the reasonable control of the nonperforming party.

(f)     The headings and captions used in this Agreement are for convenience of reference only and shall not in any way affect the interpretation of the provisions of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**COMPANY:**

Dated: 7/2/2024

*[DocuSigned by: Anna Reed, D017FD6CB530400...]*

Anna Reed, CEO
Thin Blue Line Benefits Association Holdings, LLC

**CONTRACTOR:**

Dated: 7/2/2024

*[DocuSigned by: 93E16B1444A242F...]*

Matthew Clay

# EXHIBIT 1

## STATEMENT OF WORK & PAYMENT

**Payment:**

$14,000/month, paid on the 15th day of the month the provision of services

*(e.g. for Services from August 1 – August 31, 2024, payment is due on August 15, 2024)*

**Services:**

Attempt to acquire new unions or associations within the NFOP and Fire Unions nationwide. Contractor is expected to attend major or important FOP and State IAFF conferences nationwide as contractor is available or at the discretion of the contractor (e.g. not all union conferences are of the same importance or necessity of attendance by contractor, such as a national meeting vs. a particular state or local conference).

Maintain and develop the relationships with key union and labor leadership persons nationwide that are directly related to the Company's work, including but not limited to initiating and participating in communications with union leaders to maintain ongoing relationships regarding sales and marketing of the company's health insurance products.

Train Company personnel with the transition of the management of FOP invoicing and union affinity member tracking.

Train Company personnel on communications to newly acquired Company Association members; and provide templates as needed to assist Company with the transition.

[Signature: aR] [Signature: MC]